# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of: | ) |
| information associated with a certain cellular telephone assigned call number 920-858-8959, that is stored at premises controlled by U.S. Cellular | )<br>)<br>) Case No. _19.MJ-1245_<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A2

over which the Court has jurisdiction pursuant to Title 18, United States Code, Sections 2703 and 2711, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of 18 U.S.C. § 1951, 18 U.S.C. § 924(c)(1)(A)(ii), 18 U.S.C. §§ 922(g)(1) and 924(a)(2), 18 U.S.C. § 4, 18 U.S.C. §§ 922(d)(1), 924(a)(2), 18 U.S.C. § 1519, and 18 U.S.C. § 1001.

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Phillip Simenur (Detective)
Printed Name and Title

Sworn to before me and signed in my presence:

Date: _3/27/19_

_____
Judge's signature

City and State: <u>Milwaukee, Wisconsin</u>

William E. Duffin, United States Magistrate Judge
Printed Name and Title

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR SEARCH WARRANTS

I, Detective Phillip Simmert, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for search warrants for the following:

   a. Attachment A1: information associated with certain cellular telephones assigned call numbers 414-578-0901, 414-578-0046, 414-306-1837, and 414-502-6260, that is stored at premises controlled by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way in Parsippany, New Jersey 07054.

   b. Attachment A2: information associated with a certain cellular telephone assigned call number 920-858-8959, that is stored at premises controlled by U.S. Cellular, a wireless telephone service provider headquartered at 8410 Bryn Mawr Avenue, Suite 800 in Chicago, Illinois 60631

2. The information to be searched is described in the following paragraphs and in Attachments A1 and A2. This affidavit is made in support of an application for search warrants under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) to require T-Mobile and U.S. Cellular to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate the items described in Section II of Attachment B.

3. I am a detective with the Milwaukee Police Department's Criminal Investigations Bureau (CIB) – Robbery Division. I have been employed as a law enforcement officer for over seventeen years. I am currently assigned to the Federal Bureau of Investigation's Milwaukee Area Violent Crimes Task Force, where I regularly investigate violent crimes including bank robberies, commercial robberies, and carjackings.

4. I have received formal training in the investigation of violent crimes and extensive on-the-job training and experience in the investigation of robberies. I have regularly used subpoenas, warrants, and court orders during those investigation to obtain investigative leads and corroborative evidence. I have also regularly used electronic evidence, including evidence obtained from social media platforms, phone extractions, electronic communication service providers, and remote computing service providers to identify targets, subjects, and witnesses, to obtain evidence of intent, motive, manner, and means, and to identify the instrumentalities and proceeds of crime.

5. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal offenses.

6. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show simply that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter. Throughout this affidavit, I refer to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom I have had regular contact about this investigation.

7. Based on the facts as set forth in this affidavit, there is probable cause to believe that the information described in Attachments A1 and A2 contains evidence of violations of 18 U.S.C. § 1951 (interference with commerce by robbery and conspiracy to do the same), 18 U.S.C. § 924(c)(1)(A)(ii) (brandishing a firearm during a crime of violence), 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (unlawful possession of a firearm by a prohibited person), 18 U.S.C. § 4 (misprision), 18 U.S.C. §§ 922(d)(1), 924(a)(2) (knowingly transferring a firearm to a prohibited person), 18 U.S.C. § 1519 (destruction of records), and 18 U.S.C. § 1001 (false statements to government agents), as described in Attachment B.

**PROBABLE CAUSE**

**FIRST ROBBERY – DECEMBER 1, 2018**

1.　　　On December 1, 2018 at approximately 8:12 p.m., an armed robbery occurred at the T-Mobile store located at 138 East Capitol Drive in Milwaukee. The robbery was captured on surveillance video.

2.　　　At approximately 8:10 p.m., the store manager, Lena Johnson, took out the garbage—something out of the ordinary. Before doing so, she put down the metal security shutters. This concealed the robbery from any passerbys. While outside, a black male wearing a black hooded sweatshirt, black pants, and black boots approached Lena. That person was later identified as William Johnson—Lena's husband. William, who wore a black mask to cover his face, was armed with a chrome-and-black semi-automatic handgun. William walked Lena back into the store with the gun pointed at her back.

3.　　　After entering, William walked to the breakroom leaving Lena at the front entrance. Oddly, Lena did not flee or call the police. Instead, Lena shut the security shutters over the front door and slowly walked towards the breakroom without any sign of fear.

4.　　　Two other employees were working at the time—Shakela Glover and Ariel Harsh. One of those employees, Harsh was counting money in the breakroom in advance of the store closing. Glover, who was wearing sunglasses inside, walked back with a second cash drawer, right before William entered. She looked up at the security camera for a moment and then calmly looked in William's direction.

5.　　　Glover and Harsh then laid down on the floor, reportedly at the direction of William. William pointed the gun at both Glover and Harsh. Glover then picked up William's backpack and went to the two cash drawers—perfectly placed side-by-side on the desk.

6. Glover then started taking cash out of the drawer and placing them in William's backpack, while William gently pressed on her back. She continued to diligently grab the cash, while William walked back to the front. William then walked Lena back with a gun pointed at her back.

7. William initially pushed Lena to the floor, while Glover continued taking the cash. Lena then led William to the safe room, while Glover continued diligently grabbing cash, double checking to confirm that she did not leave any bills. Glover's body language was strange and inconsistent with that of a robbery victim.

8. In the safe room, Lena opened one safe. William then directed Glover to open another safe while William pointed the gun at her. Glover took the Apple iPhones one at a time and placed them in the backpack.

9. As William walked back through the breakroom with Harsh lying on the ground, William put his gun in his hoodie pocket and walked back through the store and out of the front entrance.

10. After William fled, Glover awkwardly ran to the front (as if pretending). Harsh got up, checked under the cash drawer, and looked for her phone. After checking their phones and texting, Lena, Glover, and Harsh then walked to the front of the store.

11. Glover was interviewed on scene by Detective Alexander Ayala of the Milwaukee Police Department. Glover stated in substance to Detective Ayala that she grabbed her cash drawer in advance of closing the store, at which point she observed her manager Lena coming inside the store with a masked subject pointing a gun at her. Glover claimed that she ran to the back and that the robber ordered her to lay on the ground. The robber then threw the backpack at Glover and ordered her to put the money and cell phones into the backpack, which she did. Glover claimed that she got back on the ground, at which point the robber took the bag and left. When Glover heard the door bell and knew the robber had left, she jumped up, hit the alarm button, and called 911.

12. Shakela Glover provided the following pedigree information to case agents:

a. Name: Shakela T. Glover
    i. Date of birth: 02-17-1992
    ii. Address: 2523 West Garfield Avenue, Milwaukee, Wisconsin 53205
    iii. Phone: 414-306-1837.

13.    That same pedigree information was also provided by Angela Carrao, Asset Protection Auditor for Wireless Vision.

14.    Lena was also interviewed on scene by Police Officer Molly Krueger and Detective Kent Gordon. In substance, Lena claimed that she took out the trash before closing. While doing so, the robber approached, pointed a handgun at her, and stated "get back in the fucking store." She claimed that she felt the robber push a hard object in the middle of her back. Lena claimed that, after unlocking the front door to the store, she entered with the robber. Lena claimed that the robber ordered her to lock the door and that she complied, and that he ordered her to lay on the ground. Lena stated that the robber came back and asked her about the safes. Lena claimed that the robber ordered them to lay on the ground, and that they did so until he left, at which point she pushed the panic alarm and called 911. Lena also claimed that she thought that Glover had put the "bait phone" in the robber's backpack until she saw the bait phone was still on the shelf.

15.    Lena Johnson provided the following pedigree information to case agents:

a. Name: Lena Khiara Johnson
    i. Date of birth: 09-04-1990
    ii. Address: 5471 North 42nd Street, Milwaukee, Wisconsin 53209
    iii. Phone: 414-578-0046.

16.    Angela Carrao, Asset Protection Auditor for Wireless Vision, provided the following pedigree information for Ariel Harsh:

a. Name: Ariel Harsh
    i. Date of birth: 12-19-1995
    ii. Address: 3737 West Cheyenne Street, Apartment 1, Milwaukee, Wisconsin 53209
    iii. Phone: 920-858-8959

b. This phone number is consistent with a phone number for "Lil Mermaid," who participated in a group text of T-Mobile employees discussing the second robbery, as documented in Glover's phone extraction report.

17. In total, William took approximately $5,168.00 and nine Apple iPhone XS Max cell phones with a total value of approximately $8,845.68.

## SECOND ROBBERY – FEBRUARY 13, 2019

18. On February 13, 2019 at approximately 10:46 a.m., a second armed robbery occurred at the T-Mobile store located at 1438 East Brady Street in Milwaukee. That robbery was also captured on surveillance video.

19. Alissa Senda, an employee at the T-Mobile store, stated that she heard the front door open and observed a man, later identified as William Johnson, enter. He was wearing a dark hoodie with the hood up. William also had on a dark colored mask covering his face and was armed with a semiautomatic handgun, which he pointed at Senda and another coworker Zulymar Crespo.

20. Senda stated that William yelled "go to the back." Frightened, Senda entered the PIN to open the back room. William then pointed the gun at Senda and Crespo and ordered them into the back room and told them to lay on the ground. Senda complied, but watched William filling his bag with cell phones. William, again, ordered them not to move and then fled the store.

21. Detective Tony Castro interviewed Crespo. Crespo stated in substance that she was working with Senda. Crespo claimed that the robber had come into the store. She observed the robber holding a handgun in his right hand. The robber pressed the gun to her back, ordered her to the back, and ordered them to enter the code to open the back office door. Senda complied with the robber and entered the unlock code. Once inside the back room, the robber ordered them to get on the ground, at which point they both laid down. After the robber fled, they called the police.

22. Zulymar Crespo provided the following pedigree information to case agents:

    a. Name: Zulymar Crespo
        i. Date of birth: 11-07-1994
        ii. Address: 7726 West Becher Street, Apartment 13, West Allis, Wisconsin 53219
        iii. Phone: 414-502-6260.

23. That same pedigree information was also provided by Angela Carrao, Asset Protection Auditor for Wireless Vision.

24. Surveillance video from that robbery shows William looking at the stock keeping unit (SKU) numbers, a machine-readable bar code for inventory tracking, on the cellphone boxes. As a matter of course, T-Mobile typically keeps a bait phone in the safe with the rest of the inventory. That bait phone has a specific SKU number. William took all of the cell phones in the safe except for the bait phone. Only an employee would know the SKU number for the bait phone.

25. In total, William took cell phones with a total value of approximately $14,923.

## INVESTIGATION

26. Case agents obtained surveillance video from that day showing William stepping out of the passenger side of a dark grey Chevrolet Tahoe with Wisconsin license plate 951-YFB right before the robbery. That license plate and vehicle is registered to William Johnson at 5471 North 42nd Street in Milwaukee, Wisconsin—an address also listed for William's wife Lena.

27. A review of law enforcement records shows that Lena Johnson was stopped in that Chevrolet Tahoe on November 18, 2017 and that Lena Johnson received a citation while driving that vehicle on March 28, 2018.

28. Case agents also obtained surveillance video from a Milwaukee County Transit System bus, which captured the Johnsons' Chevrolet Tahoe driving westwards on Brady Street after the robbery.

29.     Case agents identified several distinguishing features about the Johnsons' Chevrolet Tahoe— a distinctive after-market rectangular exhaust tip extending from the right rear quarter panel, a center cap on the black steel rim of the right rear wheel, aluminum rims on the remaining wheels, and after-market window exhaust vents.

30.     On February 17, 2019 at approximately 9:30 a.m., Detective Simmert observed the Johnsons' Chevrolet Tahoe parked in the driveway of 5471 North 42nd Street. Upon knocking on the door, Lena answered and allowed the police to enter their residence. Lena stated that she and her husband reside at that address and that she was the sole driver of the Chevrolet Tahoe on Wednesday, February 13, 2019. She claimed that her phone would not place her anywhere near Brady Street at the time of the robbery and that no text messages on her phone would implicate her in the robberies. Lena also provided consent to search her residence. During the search, case agents located shoes similar to the ones used during the Brady Street robbery and gloves, face mask, and blue jeans similar to those used in the robbery. They also recovered Lena's Apple iPhone and William's Apple iPhone.

31.     A search of the Tahoe revealed a silver-over-black Smith & Wesson .40 caliber handgun with a laser sight with 12 hollow-point bullets in the magazine and 1 in the chamber, which matched the one used in the robberies. Case agents recovered that gun from between the driver's seat and front console, along with registration documents listing the vehicle to William Johnson.

32.     William Johnson was previously adjudicated a delinquent for the felony offense of Armed Robbery, in violation of Wisconsin Statute 943.32, in Milwaukee County Juvenile Court Case No. 2003JV1362 on December 26, 2003. That adjudication remains of record and unreversed.

33.     During an interview with Detective David Anderson, William Johnson admitted that he committed the robberies at the T-Mobile stores on December 1, 2018 and February 13, 2019.

34.     With respect to the robbery on December 1, 2018, William implicated his wife and Shakela Glover. William claimed that he received a call from Lena on the day of the robbery. Lena

indicated that she and Glover thought that William should rob the T-Mobile store and that the store had about $6,000 in cash. William indicated that he could hear Glover saying that the robbery had to "make sense" and "look like it is random." William indicated that they planned for Lena or Glover to take out the trash out, at which point William would push them back in the store with his gun. William indicated that Lena wanted him to point the gun at her to make the robbery look real. He stated that, after the robbery, they split the money three ways, with William, Lena, and Glover each taking $1,700, at the Johnsons' house. Glover did not want the cell phones. William later sold the cell phones at a corner store located at North 39th Street and West Burleigh Street in Milwaukee. Case agents later identified this corner store as Hakote Food Mart, located at 3830 West Burleigh Street.

35. With respect to the robbery on February 13, 2019, William implicated his wife Lena and Zulymar Crespo. He indicated that his wife received a call from Crespo informing them of the best time to commit the robbery and providing information about the bait phone. William also stated that his wife Lena and son were with him during the robbery. Lena drove the Chevrolet Tahoe and dropped him off near the store. William admitted that he had the gun, which Lena had purchased for him, at the time of the robbery and that the gun was loaded. Lena waited in the Tahoe on the side of the store and then drove during the getaway. After the robbery, they drove to the Hakote Food Mart to sell the phones.

36. William Johnson provided the following pedigree information to case agents:

    a. Name: William Andrew Johnson
        i. Date of birth: 01-25-1987
        ii. Phone: 414-375-6569; 414-578-0901
        iii. Address: 5471 North 42nd Street, Milwaukee, Wisconsin 53209

37. Case agents obtained surveillance video from the Hakote Food Mart from February 13, 2019, which shows William step out of the passenger side of the Tahoe, walk into the store with the bag

shortly after, hand the bag to a store employee, leave, and then reenter the passenger side of the Tahoe—less than an hour after the robbery.

38.     During interviews with case agents, Lena denied any involvement in the robberies and denied that her husband was involved in the robberies. She again provided a phone number of 414-578-0046. Lena stated that she is married to and has two children with William Johnson. She stated that she purchased the gun recovered from the Chevrolet Tahoe as a gift for her husband William Johnson about four years ago.

39.     During interviews with case agents, Shakela Glover also denied any involvement in the robbery and, again, recounted her description of the robbery on December 1, 2018. That said, Glover admitted that she is close with Lena and indicated that they call each other cousins, even though they are not related by blood.

40.     Case agents obtained surveillance video and transaction records from the Walmart store located at 401 East Capitol Drive in Milwaukee. That surveillance video shows the Johnsons' Chevrolet Tahoe pull in front of the entrance to the Walmart and drop off Lena. At about 10:22 a.m. on February 13, 2019, the surveillance video and transaction records show Lena purchasing scissors, Gorilla tape, and a sweatshirt at the register, before voiding the purchase of the scissors and Gorilla tape. That surveillance video also shows Lena then leaving the Walmart. The hooded sweatshirt that Lena purchased at Walmart—minutes before the robbery—is consistent with the hooded sweatshirt that William wore during the robbery on February 13, 2019, as captured by surveillance video.

41.     On February 19, 2019, I interviewed Zulymar Crespo. She stated that she received a phone call from Lena the night before the robbery asking what time Crespo would work, what time Dunbar Armored security comes to the store, and if Crespo still had the codes.[1] Apparently, Lena

---

[1] This information is consistent with the call history on Lena Johnson's Apple iPhone, which indicates that Lena placed an outgoing call to Zulymar Crespo at 414-502-6260 on February 12, 2019 at 10:09 p.m. That call only lasted four seconds.

indicated that the robbery would happen the next day, but not how the robbery would happen. Lena indicated that she would pay Crespo $200 after the robbery, but that Crespo never received the proceeds and never had any intention of taking the money. Crespo denied telling Lena anything about the bait phone.

## PHONE EXTRACTIONS

42.     Case agents forensically extracted the data from William Johnson's Apple iPhone. The extraction report indicates that William's phone has a call number of 414-578-0901 and Apple ID wjohnson8710@gmail.com.

43.     Immediately after the robbery on December 1, 2018, William sent and received the following text messages directly after the robbery on December 1, 2018:

| 28157 | Instant Messages | Incoming | | | 12/1/2018 21:13(UTC-6) | From: +14145303219 Z | Gone let ya boy hold a dollar or two if u can stand it |
|-------|------|------|--|--|------|------|------|
| | | | | | | | Source Extraction: File System |
| 28158 | SMS Messages | Outgoing | | | 12/1/2018 21:15(UTC-6) | To: +14145303219 Z | Gotta wait for the wife to make it here to bust it down. But I'll see what I can do bro |
| | | | | | | | Source Extraction: File System, Logical |
| 28159 | Instant Messages | | | | 12/1/2018 21:21(UTC-6) | From: +14145303219 Z | Fa sho |
| | | | | | | | Source Extraction: Logical |

44.     William and Lena also exchanged text messages implicating Lena, Zulymar Crespo, and Audreanna Watson, who was charged in an unrelated burglary, in a prepaid scam at T-Mobile. In those messages, William asks whether Crespo or Watson "ratted" on Lena, to which Lena responds: "They didn't snitch." Lena indicates that the prepaid scam was "Bigg!!" and expresses concern that T-Mobile may find "the old deposit shit."

45.     In a different string of text messages, William contacts another person about buying a laser "beam" for his "Smith & Wesson 40." Some of these messages were sent and received as Apple

---

However, Crespo and Lena had another call at 10:09 p.m., which lasted 3 minutes and 53 seconds, and a third call at 10:13 p.m., which lasted 2 minutes and 10 seconds.

iMessages. After these text messages were sent, officers recovered a Smith & Wesson .40 caliber handgun with a laser sight from William's Chevrolet Tahoe.

46. Case agents also forensically extracted the data from Lena's Apple iPhone. The extraction report confirms that the assigned call number for Lena's phone is 414-578-0046. The Owner ID listed on the phone was "Lena's iPhone" with an Apple ID of mz.lena9008@gmail.com.

47. On November 30, 2018—the day before the first robbery, Lena sent a text message to 414-524-9229, listed as "Rihanna,"[2] with a photograph of a "Corrective Action" issued by Wireless Vision, the corporate name for T-Mobile's retail locations, providing a final written notice to Lena about two internal policy violations. After that message, Rihanna responds: "Yeah it's time to go. Gotta rob them on the way out too.," which Lena emphasized. Rihanna later said: "Steal all the deposits," to which Lena responds: "I am!! And I'm sticking to my plan of quitting and telling them it's bc my safety was at risk.." Rihanna suggested: "Pin it on Lloyd lmao," which Lena emphasized and said: "It's gone look like he did it anyway.." Lena and Rihanna continue to discuss pinning the scheme on "Lloyd."

48. Lena also sent the photograph of the "Corrective Action" to William.

49. That evening before the robbery at 5:56 p.m., Lena tells Rihanna: "Ima talk to Drew and put shit in motion..Lbvs. I JUST CANT BELIEVE I WORKED FOR THIS BITCH ASS COMPANY FOR 7 YEARS, NEVER BEEN WROTE UP AND THEN THIS NIGGA COME FOR FIVE MINUTES AND IM ON A FINAL!!! I'm mad now.. I wanna rob him too!!!"

50. After the robbery on December 1, 2018 concluded, Lena exchanged messages with 414-306-1837, listed in her contacts as "Shakela Glover." At about 11:18 p.m., Glover asked, "House?," to

---

[2] "Rihanna" may refer to Audreanna Watson, who was charged with Burglary of a Building or Dwelling, in violation of Wisconsin Statute 943.10(1m)(a), in Milwaukee County Case No. 2019CF000520, for a burglary at the T-Mobile store located at 1438 East Brady Street in Milwaukee.

which Lena responds: "Yea." This is consistent with William's statement that Glover met at the Johnsons' house to split the proceeds of the robbery.

51.     In the early morning hours after the robbery, Lena asked Glover if she had called Lloyd. Glover responded: "Yeah. I asked him did he set us up cause he was joking about it and you was scared and would probably talk to him tomorrow cause you just wanted to be with family..........he think I think he did it and I do." Lena responded: "I do too!!!" Lena forwarded this text string to Rihanna with a winking smiley face emoji.

52.     On February 12, 2019 at 10:09 p.m.—the night before the second robbery, the call history on Lena Johnson's Apple iPhone indicates that Lena placed an outgoing call to Zulymar Crespo at 414-502-6260. That call only lasted four seconds. However, Crespo and Lena had another call at 10:09 p.m., which lasted 3 minutes and 53 seconds, and a third call at 10:13 p.m., which lasted 2 minutes and 10 seconds.

53.     Around 10:00 a.m. on February 13, 2019, Lena exchanged a text message with Rhianna at 414-524-9229 stating: "He got on a recognizable ass Adidas hoodie, no hat, no gloves, just a face mask.. Like fam…ARE YOU TRYING TI GET CAUGHT!? Didn't put tape over the gun." This message was sent shortly before Lena was captured at Walmart purchasing a hooded sweatshirt and attempting to purchase scissors and Gorilla tape. Lena goes on: "And I feel like once the pic circulates, Jerron ass gone be the one to recognize him.. We on our way now." At 10:46 a.m., Lena sent an update: "I just let him out.. Fam! The adrenaline rush off this shit is crazy!" The second robbery happened at about 10:46 a.m.

54.     Later that evening, Lena continued to text Rihanna stating that Lena contacted Crespo on Snapchat, because she wanted to know about the preliminary investigation of the second robbery. Anxious about Crespo's lack of a response, Lena texted Rhianna stating: "She probably got ptsd and shit.. Drew put the barrel on her back and shit.." I know that William Johnson's middle name is Andrew.

55.     The call history on Lena's phone for February 13, 2019 also indicates that she spoke with William at 5:57 p.m. for 1 minute and 15 seconds, Crespo at 6:49 p.m. for 6 minutes and 18 seconds, Glover at 6:58 p.m. for 14 minutes and 24 seconds, Crespo at 7:13 p.m. for 6 minutes and 17 seconds, and with William at 7:39 p.m. for 48 seconds.

56.     At about 7:00 p.m., Lena texts William at 414-578-0901 and says: "Zuly said they think it's the same guy who did East Cap.." To which he responds, "That's good and bad." Lena responds: "Why you say that??" Responding to Rihanna, Lena recounts Crespo's description of the surveillance video: "But she did say the footage was dark af and he kept his head down so you can't see shit except his shoes (which was some old ass foams that he threw away once we left) and his gun from when he flashed it."

57.     The GPS location information and wireless connectivity information indicate that Lena Johnson was at her residence located at 5471 North 42nd Street at 11:37 a.m. shortly after the robbery.

58.     Case agents also forensically extracted the data from Shakela Glover's Apple iPhone. That extraction report confirms that the phone number associated with her phone is 414-306-1837 and her Apple ID is shakelaglover@gmail.com. Glover has several texts with Lena Johnson at the phone number 414-578-0046. There were numerous texts exchanged with Lena contained in the phone's extracted data, but the only calls exchanged were on February 8, February 9, February 14, and February 17, 2019. The call history prior this appears to have been deleted. The extracted data has no search history between October 5, 2018 and December 23, 2018, even though Glover otherwise conducted searches almost every day. It appears that the search history for those dates was deleted.

59.     On or about February 19, 2019, Glover exchanged text messages with 414-524-9229, a person listed as "Shahd"—the same number listed for "Rihanna" in Lena's phone. Rihanna texted Glover saying: "But the Zuly thing really blew me. Because she got fired and arrested and jerron said she

must've name dropped because why would they also arrest Drew." Glover then responds: "Right, She still gone get charged because she was party to the crime.," referring to Crespo.

60.    Glover also discussed Lena and William's bail by text message, indicating that she had checked the website to locate an inmate and could not locate William. Glover discussed paying Lena's bail and indicated that she wanted to speak with William, if he called while in jail.

61.    As a part of this investigation, I monitored Glover's jail calls. On February 25, 2019, Glover placed a phone call to her mother Felicia Jackson at 414-419-7540. Glover instructed her mother to contact T-Mobile and delete her iCloud account. Glover gave specific instructions to her that T-Mobile will ask for an authentication ID and send a code to the phone. Glover provided her mother with a personal identification number (PIN) of 9886 and an Apple iCloud password. Glover also instructed her mother to change the SIM card on the phone and to log on to the computer and delete all devices. Glover's directives to her mother evinced not only a consciousness of guilt, but an attempt to destroy records or evidence relating to this investigation.

62.    Finally, case agents extracted the data from Zulymar Crespo's Apple iPhone. That extraction report confirms that the phone number associated with her phone is 414-502-6260. The Apple ID listed in the extraction report is mikemarrero2004@gmail.com and the Facebook account is latinabella10191@gmail.com.

63.    That extraction report also indicates that Crespo sent a message to 414-520-7271 on or about December 14, 2018 stating: "Dawg I just got off the phone with Lena," with a smack-in-the-face emoji. Crespo continues to express some concern about the fraud investigations at the Brady Street location.

64.    I know that Assistant United States Attorney Philip T. Kovoor confirmed that T-Mobile is the wireless telephone service provider for call numbers 414-578-0901, 414-578-0046, 414-306-1837,

and 414-502-6260 and that U.S. Cellular is the wireless telephone service provider for call number 920-858-8959 on the Internet database Fonefinder.net, which I have used in the past and found to be reliable.

65.     In my training and experience, I have learned that T-Mobile and U.S. Cellular are companies that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone, but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

66.     Based on my training and experience, I know that T-Mobile and U.S. Cellular can collect cell-site data about the cellular telephones using their networks. I also know that wireless providers such as T-Mobile and U.S. Cellular typically collect and retain cell-site and other cellular network data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes. From this data, wireless providers such as T-Mobile and U.S. Cellular also estimate the historical locations of cellular telephones using their networks. These estimates are drawn from data collected in the normal course of business, including cell-site and other cellular network data.

67.     Based on my training and experience, I know that wireless providers such as T-Mobile and U.S. Cellular typically collect and retain information about their subscribers in their normal course

of business. This information can include basic personal information about the subscriber, such as name and address, and the methods of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as T-Mobile and U.S. Cellular typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business.

68. This is a complex investigation of two robberies involving multiple targets, subjects, and witnesses at two locations on two dates. Many of those people work for wireless telephone providers and are, presumably, familiar with cellular device technology. The evidence indicates that the targets, subjects, and witnesses communicated regularly using cellphones, that they were engaged in an ongoing criminal scheme, and that the targets and subjects actively took steps to conceal their activities. At the very least, the requested information will provide corroboration of the evidence described-above, including but not limited to the information contained in the extraction reports, and provide another method for authenticating that information. In light of the apparent destruction of evidence and attempts to destroy evidence, the requested information will likely contain evidence that has been deleted, altered, or destroyed from those cellular devices.

69. In my training and experience, the requested information may constitute evidence of the crimes under investigation because the information can be used to identify the user or users of the target cellular telephones and may assist in the identification of co-conspirators. As described above, the home and work addresses of the targets, subjects, and witnesses are known to case agents, along with the location of the T-Mobile stores and the phone fence—Hakote Food Mart. The requested information will establish the use or possession of the target cellphones in relation to those locations. The requested information is also material to the existence and scope of the conspiracy, the relationships between the targets, subjects, and witnesses (including the frequency of their telephone communications and the

locations that they frequent alone and together), and the locations of the target cell phones (and, therefore, the targets, subjects, and witnesses) before, during, and after crimes under investigation.

## AUTHORIZATION REQUEST

70.     Based on the foregoing, I request that the Court issue the proposed search warrants, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

71.     I further request that the Court direct T-Mobile and U.S. Cellular to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.  Because the warrants will be served on T-Mobile and U.S. Cellular, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrants at any time in the day or night.

## ATTACHMENT A1 – T-MOBILE

### Property to Be Searched

This warrant applies to the following:

      a.    Records and information associated with certain cellular telephones assigned call numbers 414-578-0901, 414-578-0046, 414-306-1837, and 414-502-6260, that is stored at premises controlled by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way in Parsippany, New Jersey 07054.

## ATTACHMENT A2 – U.S. CELLULAR

### Property to Be Searched

This warrant applies to the following:

b.        Records and information associated with certain a cellular telephone assigned call number 920-858-8959, that is stored at premises controlled by U.S. Cellular, a wireless telephone service provider headquartered at 8410 Bryn Mawr Avenue, Suite 800 in Chicago, Illinois 60631

## ATTACHMENT B

### Particular Things to be Seized

**I.  Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A1 or Attachment A2 is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account(s) listed in Attachment A1 or Attachment A2 for the time period **September 1, 2018 through March 26, 2019:**

a.  The following information about the customers or subscribers of the Account(s):

    i.  Names (including subscriber names, user names, and screen names);

    ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    iii.  Dates of birth;

    iv.  Alternate phone numbers;

    v.  Other phone numbers on the same Account(s);

    vi.  Local and long distance telephone connection records;

    vii.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    viii.  Length of service (including start date) and types of service utilized;

    ix.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number

("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

    x.    Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

    xi.    Means and source of payment for such service (including any credit card or bank account number) and billing records.

    b.    All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account(s), including:

    i.    the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses);

    ii.    information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received, including the locations of any cell tower and antenna face; and

    iii.    historical location records (including historical locational precision information, historical handset location data, estimated location records, geolocation information (PING), Network Event Location System (NELOS) data, Global Positioning System (GPS) data, cell tower triangulation or trilateration, round-trip time (RTT), per-call measurement data (PCMD), historical E911 data, or precision measurement information).

    c.    A list of definitions or keys identifying all information contained in the records.


The Provider is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 1951 (interference with commerce by robbery and conspiracy to do the same), 18 U.S.C. § 924(c)(1)(A)(ii) (brandishing a firearm during a crime of violence), 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (unlawful possession of a firearm by a prohibited person), 18 U.S.C. § 4 (misprision), 18 U.S.C. §§ 922(d)(1), 924(a)(2) (knowingly transferring a firearm to a prohibited person), 18 U.S.C. § 1519 (destruction of records), and 18 U.S.C. § 1001 (false statements to government agents) during the period **September 1, 2018 through March 26, 2019.**